JOHN WANAMAKER PHILADELPHIA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JOHN WANAMAKER NEW YORK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 23156, 23157, 23158. Promulgated March 4, 1931.

488

*J. Marvin Haynes, Esq.,* and *Thomas G. Haight, Esq.,* for the petitioners.

*J. L. Backstrom, Esq.,* and *P. A. Sebastian, Esq.,* for the respondent.

494

496

## OPINION.

Murdock: The Commissioner's final determination of an overassessment of taxes against John Wanamaker Philadelphia for the fiscal year ended January 31, 1917, resulted from a rejection in part of a claim in abatement; therefore we have jurisdiction as to that fiscal year. *Continental Accounting & Audit Co.*, 2 B. T. A. 761; *Powell Coal Co.*, 12 B. T. A. 492.

The Commissioner challenges our jurisdiction to consider. and determine the question of a deficiency for the period from February 1, 1915, to December 31, 1915, both dates inclusive, which period was a part of the fiscal year ended January 31, 1916. In *David B. Mills*, 1 B. T. A. 199, we decided that the Board, by reason of the provisions of section 280 of the Revenue Act of 1924, has no jurisdiction as to deficiencies in taxes imposed by statutes prior to the Revenue Act of 1916. See also *John Guitar*, 1 B. T. A. 213; *Charles J. Kinzel*, 1 B. T. A. 719. We are of the opinion, however, that the taxes for all of the fiscal year ended January 31, 1916, were imposed by the Revenue Act of 1916 and that we have jurisdiction to redetermine the deficiency for the full fiscal year. The Revenue Act of 1913 imposed an annual tax of one per cent upon the net income of every corporation. Section II G (c) of that act provided that any corporation subject to the tax might designate the last day of any month in the year as the day of the closing of its fiscal year, and should be entitled to have the tax payable by it computed upon the basis of the net income for the fiscal year so designated. The corporations which used this system were required to render returns within sixty days after the close of the fiscal year and also to give notice to the Collector of the day designated for closing a fiscal year.

The Revenue Act of 1916 was approved on September 8, 1916. In general it increased the tax rate on income of corporations from 1 per cent to 2 per cent. Section 10 provided in part as follows:

The foregoing tax rate [2 per cent] shall apply to the total net income received by every taxable corporation * * * in the calendar year nineteen hundred and sixteen and in each year thereafter, except that if it has fixed its own fiscal year under the provisions of existing law, the foregoing rate shall apply to the proportion of the total net income returned for the fiscal year ending prior to December thirty-first, nineteen hundred and sixteen, which the period between January first, nineteen hundred and sixteen, and the end of such fiscal year bears to the whole of such fiscal year, and the rate fixed in Section II of the Act approved October third, nineteen hundred and thirteen, * * * shall apply to the remaining portion of the total net income returned for such fiscal year.

Section 24 of the 1916 Act repealed Section II of the 1913 Act "except as herein otherwise provided, and except that it shall remain in force for the assessment and collection of all taxes which have accrued thereunder."

Section 25 of the 1916 Act was in part as follows:

That income on which has been assessed the tax imposed by Section II of the Act * * * approved October third, nineteen hundred and thirteen, shall not be considered as income within the meaning of this title: *Provided*, That this section shall not conflict with that portion of section ten, of this title, under which a taxpayer has fixed its own fiscal year.

From a study of the two acts, we have come to the conclusion that the 1916 Act imposed the tax in this case by adopting the rate fixed in Section II of the 1913 Act as the proper rate to apply to the portion of the total net income which it allocated to the 1915 portion of the fiscal year ended in 1916. So far as a case like the present is concerned, Section II of the Revenue Act of 1913 could have been entirely repealed because section 10 of the Revenue Act of 1916, by its own terms, imposes a tax on the income for the full fiscal year ending in the calendar year 1916. Cf. *Davis Feed Co.*, 2 B. T. A. 616; *T. B. Hord Grain Co.*, 6 B. T. A. 549; affd., 25 Fed. (2d) 536; certiorari denied, 278 U. S. 612.

The petitioners contend that the inventory figures, as finally approved by Barker or Appel, should be used in computing their net incomes for each of the years in question. The Commissioner, explaining that certain reductions have not been substantiated or accounted for, has added the amounts to the petitioners' income for the respective years. It is not clear that all of his additions were due to the rejection of the inventory adjustments made by Barker and Appel. The petitioners' proof of the inventory changes made by the Commissioner for some of the years before us depends upon a supposed inference to be drawn from a comparison of the amounts added to income by the Commissioner and the figures on the fly-leaf memorandum made as set forth in the findings of fact. The memorandum figures obviously are cumulative, that is, the adjustment on any particular inventory would be the difference between the figures shown opposite the date on which that inventory was taken and the figures shown opposite the preceding inventory date. The petitioners argue that since the amount of the adjustment as thus determined coincides with the amount which the Commissioner has added to income, the effect of the Commissioner's act was to disallow the deduction made in that year by Barker or Appel. A comparison of the two sets of figures for the taxable years 1918 and 1919 shows that they do not coincide and are not the same. The failure of these figures to coincide has not been explained, and the supposed infer-

ence does not arise. The memorandum figures for the New York store show a decrease from 1915 to 1916, which fact does not fit in with the petitioner's contention and has not been explained. But in general it does appear that the amounts added by the Commissioner are closely related to the changes made by Barker and Appel.

The use of inventories in the computation of income first received legislative recognition in the Revenue Act of 1918. Section 203 thereof provided:

That whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Prior to the passage of the Revenue Act of 1918, however, the Commissioner in his regulations provided for the use of inventories in the computation of income. As early as January 5, 1914, inventories were prescribed by him as necessary in computing the income of certain classes of corporations. See Regulations 33, article 161, promulgated under the Revenue Act of 1913. See also Regulations 33 (Revised), articles 91, 92, and 120, promulgated January 2, 1918, under the Revenue Acts of 1916 and 1917; and Regulations 45, article 1581 *et seq.*, promulgated April 17, 1919, under the Revenue Act of 1918. Since the promulgation of Treasury Decision 2609 on December 19, 1917, the Commissioner has authorized the taking of inventories on the basis of (a) cost, or (b) cost or market, whichever is lower; and these bases, when properly applied, have been approved by this Board.

The Commissioner has required by his regulations throughout the period here involved that each taxpayer keep books of account and records of its business so that he can inspect such books and records for the purpose of the verification and the determination of a proper return of income for tax purposes. Article 182 of Regulations 33 required that "the business transacted by corporations must be so recorded that each and every item set forth in the return of annual net income may be readily verified by an examination of the books of account." See also articles 50, 88, and 160 of Regulations 33 (Revised). In article 1582 of Regulations 45 he specifically required the preservation of inventory records.

The petitioners have introduced considerable evidence to show generally that their merchandise managers had to make adjustments to eliminate improper figures in the cost or market figures which came to them during the compilation of the final inventory figures and that these adjustments were made of necessity, to conform the

inventory to cost or market whichever was lower. We agree with the petitioners that as a method this system was proper, but the issue presented is broader than this and we still have the question, Were the *particular* adjustments which were made under this system in each year proper? The Commissioner has determined that they were not. Let us see what evidence there is in the record to overcome the effect of this determination.

Barker and Appel, the principal witnesses for the petitioners on this point, have told us that the adjustments were generally made for each of a number of different reasons. But as to any particular adjustment for any particular year they were unable to testify. Neither could break up the amount of the total adjustment for any year or explain what portion of the total for any year was made for any certain purpose. Neither could state the reasons for the adjustments of any particular year, that is, although they knew that generally adjustments had to be made for the various reasons explained, they could not say that in a given year an adjustment was made for a given reason. They said they could not be more specific in their testimony without the appropriate summary sheets and the accompanying memoranda which they had used in making the adjustments in question. No inventory records have been offered in evidence. The petitioners admit that they have failed to preserve their complete inventory records. Counsel for the petitioners stated that the petitioners had a receipt from the Government for some of the inventory records, and a witness testified that he believed some inventory sheets had been turned over to the Government. But the receipt was not offered in evidence, no demand was made and no subpoena was issued to have the Government produce any particular sheets which might be in its possession, and the testimony was most confusing as to just what sheets, if any, had been turned over to the Government, the time they had been turned over, the person to whom they had been turned over and the relation of this time to March 1, 1923, when the Commissioner first notified the petitioners that he was adding certain of these amounts to income. Quite clearly this testimony does not relieve the petitioners of the consequences of failing to produce adequate proof. If there had been testimony, in sufficient detail, as to all of the separate adjustments going to make up the total for each year, then we would have been in position to have decided the question presented to us and it is conceivable that we might have approved some and disapproved others. Without such testimony we should not blindly approve all because we are convinced that the system was proper and under it there would surely be some necessary adjustments.

The present state of the record forces us to either accept the statements of the merchandise managers that the adjustments made, whatever they were, were necessary and proper because they only made such changes as they thought were proper, or affirm the Commissioner. No one will question the necessity for investigation by the Commissioner of those activities of a taxpayer which relate to tax matters, nor his right to inquire into those activities and the records thereof in order to determine whether or not the report made by the taxpayer correctly discloses its true tax liability. He is deprived under the petitioners' method of proof, of the benefit of any useful cross-examination. It does not appear that there are complete records with which he could make an investigation independently of the proof offered or that he has ever had a reasonable opportunity to make such an investigation. If we accept the evidence offered as full proof of the issue, the Commissioner will have learned nothing that he did not know when he first questioned and disallowed the deductions. Any attempt to test the accuracy of the reductions made or the propriety of the reason therefor, the very things questioned, will be futile since the witnesses admit their inability, in the absence of the records, to explain the adjustments further than to tell the general nature of those they made and considered proper. The Commissioner's investigation and attempted verification will be frustated and our review and our judgment will amount to nothing. Cf. *Adelphi Paint & Color Works, Inc.*, 18 B. T. A. 436. Granting that the intentions of these two men were good and that their system was proper, nevertheless, the Commissioner should be protected in his efforts to determine the correctness of what they did. Obviously, the evidence does not answer the question before us in the way that the petitioners contend.

Under similar circumstances in the case of *Harry P. True et al.*, 6 B. T. A. 1042, we said:

The substance of the testimony of the two partners was that their valuation represented what in their judgment was market value; and the Washington jewelry dealer said that this was the method used generally in this business. How nearly their judgment approximated the fact of value or whether their judgment has been well founded, does not appear. Thus, the Board, instead of being able to use its own judgment upon evidence to determine whether the figures truly represent market value, is asked to place its stamp of approval upon the judgment of the petitioners themselves. How utterly vacuous such a proceeding would be must be apparent.

The witnesses stated that during this period adjustments were made to take into account the reduced selling prices of goods which went into effect in February of each year. The Commissioner had a regulation (art. 1584, Reg. 45) covering such a situation which pro-

vided that an adjustment of this kind would be allowed if supported by evidence that the goods were *bona fide* offered for sale at the reduced prices within a reasonable time after the inventory date. We do not know the amount of any such adjustment made in any particular year, to what goods any such adjustment related, nor that the goods were offered for sale as required. Cf. *Summit Wholesale Grocery Co.*, 1 B. T. A. 1040; *Farmers' Hardware Co.*, 2 B. T. A. 90.

In the alternative, the petitioners contend that the Commissioner has been inconsistent in the matter of adding to inventories the amounts in question whereas the petitioners have consistently reduced the figures in the way complained of. Consistency in inventory methods is important but we would not be justified in changing the Commissioner's determination on this point on the ground of inconsistency. There might be a serious inconsistency in the action of the Commissioner if he has failed to make a change in the opening inventory of each store for the fiscal year 1916. He denied that he has not made similar changes in these inventories and we can not find whether he did or not. So we can not say there was any inconsistency in his action. But if he made no change, we are not in position to require a change or to hold that any particular change will more correctly reflect the income of either store for that year. *United States* v. *Rindskopf*, 105 U. S. 418; *Wickwire* v. *Reinecke*, 275 U. S. 101; *Reinecke* v. *Spaulding*, 280 U. S. 227; *Lucas* v. *Kansas City Structural Steel Co.*, 281 U. S. 264; *Avery* v. *Commissioner of Internal Revenue*, 22 Fed. (2d) 6; *F. G. Bishoff*, 6 B. T. A. 570; affd., 27 Fed. (2d) 91; *Saxman Coal & Coke* Co., 43 Fed. (2d) 556; *Williams* v. *Commissioner of Internal Revenue*, 45 Fed. (2d) 61; *Louis Friedman*, 21 B. T. A. 38. So far as we know the changes made by Barker and Appel in that inventory may have been unquestionably right.

For the fiscal years ended January 31, 1917, and January 31, 1920, the Commissioner deducted certain amounts from the petitioner's consolidated invested capital representing tax liabilities for previous years. Since these taxes accrued in prior years, they were liabilities of the petitioner at the beginning of each of the respective years in question, and, therefore, we approve the respondent's action in reducing invested capital by the amounts thereof. *Russel Wheel & Foundry Co.*, 3 B. T. A. 1168; *Petaluma & Santa Rosa Railroad Co.*, 11 B. T. A. 541; *United States Trust Co. of New York*, 13 B. T. A. 1074; *Kossar & Co.*, 16 B. T. A. 952; *Bogle & Co.* v. *Commissioner of Internal Revenue*, 26 Fed. (2d) 771; *United States* v. *Anderson*, 269 U. S. 422; *Fawcus Machine Co.* v. *United States*, 282 U. S. 375.

The final issue concerns installment sales and is confined to the fiscal year ended January 31, 1920. It is the contention of the petitioner that it and its affiliated company are entitled to report certain of the income of the two stores for that fiscal year on the installment sales basis, and that in determining the amount of a deficiency, or of a refund or credit to which it might be entitled, and with which it has already been credited, all collections made during the fiscal year ended January 31, 1920, on sales effected in prior years should be excluded from the computation. The respondent denied the petitioner the right to report any of the income of the two stores on the installment sales basis, and determined the deficiency for the fiscal year in question by computing the income of the two stores on a straight accrual basis.

Section 212 (d) of the Revenue Act of 1926, which is made applicable to the fiscal year in controversy by section 1208 of the same act, provides in part as follows:

Under regulations prescribed by the Commisisoner with the approval of the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the total profit realized or to be realized when the payment is completed, bears to the total contract price * * *.

Section 705 (a) of the Revenue Act of 1928 provides as follows:

If any taxpayer by an original return made prior to February 26, 1926, changed the method of reporting his net income for the taxable year 1924 or any prior taxable year to the installment basis, then, if his income for such year is properly to be computed on the installment basis—

(1) No refund or credit of income, war-profits, or excess profits taxes for the year in respect of which the change is made or any subsequent year shall be made or allowed, unless the taxpayer has overpaid his taxes for such year, computed by including, in computing income, amounts received during such year on account of sales or other dispositions of property made in any prior year; and

(2) No deficiency shall be determined or found in respect of any such taxes unless the taxpayer has underpaid his taxes for such year, computed by excluding, in computing income, amounts received during such year on account of sales or other dispositions of property made in any year prior to the year in respect of which the change was made.

During the fiscal year in question the two Wanamaker stores were regularly engaged in the sale of personal property on the installment plan. The petitioner is therefore entitled to have the income of the two stores from instalment sales computed upon the basis provided in section 212 (d), if the facts are sufficient to permit a determination of the income on that basis. See *H. A. Dunham*, 13 B.T.A. 582, and cases there cited; *Renier Music House, Inc.*, 15

B.T.A. 241. Moreover, the petitioner exercised its election to change to the installment method of reporting income by an original return filed prior to February 26, 1926, which fact brings it within the provisions of section 705 (a) of the Revenue Act of 1928.

The respondent contends that the income of the two stores from the sales of pianos and phonographs can not be computed on the installment sales basis because, *inter alia*, the evidence fails to show a proper treatment of bad debts attributable to installment accounts. In its income tax return for the fiscal year in question the petitioner deducted $256,747 as losses and bad debts arising .from sales of all kinds made in both the Philadelphia and New York stores. In *Blum's, Inc.*, 7 B. T. A. 737, we laid down the proper procedure to be followed by taxpayers in computing income on the installment sales basis with respect to sales made and canceled in the same year on account of default in payments; sales canceled, on account of default in payments, in a year subsequent to the year in which made; and the amount to be deducted from gross income as bad debts arising from canceled sales in which repossessions are not made. Without repeating here what was said in the *Blum* case in regard to computing installment sales income under these various circumstances, it is sufficient to state that the evidence in the instant case provides no basis upon which we can determine whether the deduction of $256,747 from gross income for the fiscal year in question is or is not in accordance with the rule stated in the *Blum* case. The record does not disclose the portions of this amount allocable to the respective stores; the year or years in which the sales were made from which these accounts arose; or, if any of such sales were installment sales made in years prior to the one in question, the percentage of profit on those sales, the complement of which represents the percentage to be charged off the books as unrecovered cost in case the property is not repossessed. The petitioner should have established these facts in order to entitle it to the complete relief for which it asks. All facts necessary for a determination of the installment sales income of the two stores in accordance with the quoted provisions of section 212 (d) of the Revenue Act of 1926 and of section 705 (a) (2) of the Revenue Act of 1928 are present, except these facts with respect to the deduction of $256,747 on account of losses and bad debts. Bearing most heavily on the petitioner (*George M. Cohan* v. *Commissioner of Internal Revenue*, 39 Fed. (2d) 540), but giving it the benefit to which it is entitled under the proven facts, we conclude that for the purpose of a computation under section 705 (a) (2), consolidated net income should be reduced by the amount of the unrealized profits on installment sales

made during the fiscal year in question less the amount of the deduction for losses and bad debts. This results in a reduction of consolidated net income by the amount of $610,621.97, computed in the following manner:

The total piano and phonograph sales of the New York store and the gross profits thereof, for the fiscal year ended January 31, 1920, were $1,884,127.61 and $922,594.73, respectively, the gross profits representing 48.97 per cent of the sales. The total piano and phonograph sales of the Philadelphia store and the gross profits thereof, for the same fiscal year, were $1,126,751.08 and $550,866.53, respectively, the gross profits representing 48.89 per cent of the sales. The total unpaid installment accounts of the New York and Philadelphia stores outstanding on January 31, 1920, amounted to $1,643,135.49 and $834,104.34, respectively, and these amounts include accounts arising out of installment sales of prior years in the respective amounts of $469,933.24 and $235,102.85. Therefore, the outstanding installment accounts at the close of the fiscal year ended January 31, 1920, arising out of sales made in that year were $1,173,202.25 in the case of the New York store and $599,001.49 in the case of the Philadelphia store. The unrealized profits included in these accounts, determined by applying the gross profit percentages of 48.97 and 48.89, respectively, are $574,517.14 and $292,-851.83. The sum of these amounts, or $867,368.97, reduced by $256,747, the amount of the deduction for losses and bad debts, equals $610,621.97.

It will be noted that in the above computations the average percentage of profit from sales of both pianos and phonographs in each of the two stores has been used. The evidence discloses no basis upon which the income of the Philadelphia store from the sales of each of those articles may be separately computed, while in the case of the New York store all figures entering into the separate computations of income from sales of pianos and sales of phonographs are in evidence. Whether the total income to be reported for a given year is computed by the use of an average percentage of profit on both pianos and phonographs, or by the use of the separate percentages of profit on the sales of each article, the same amount of income is eventually reported, but unless the method adopted is consistently followed until all collections on sales made in a certain year have been received, annual income may be distorted. In the instant case the separate percentages of profit on sales of pianos and phonographs are not so disproportionate that the use of the average percentage will affect substantially the tax liability of

the New York store for any of the fiscal years in which collections will be received on sales made during the fiscal year in question. For this reason, and for the sake of uniformity in the method of reporting installment sales income in the two Wanamaker stores, we have used the average profit percentage in our computations in each instance. We refrain, however, from pronouncing any general rule as to the correctness of either percentage·method as applied to cases which may later arise.

The petitioner contends that in the recomputation of its tax liability for 1920 necessary under this decision, section 705 (a) (1) has no application, but the amount of the refund or credit to which it is entitled should be computed under section 705 (a) (2). We think this contention is unsound because directly contrary to the express provisions of section 705(a). Cf. *Grand Rapids Show Case Co.*, 12 B. T. A. 1024, where under the Board's decision an overpayment was determined for the year 1921 in accordance with section 705 (a) (1). If a recomputation is made in this case under section 705 (a) (2), it will probably show an overpayment for 1920. The only effect of this is that there is no deficiency for the year. But before we can decide that a refund or credit should be made or allowed, there must be a recomputation under section 705 (a) (1) to determine whether or not the petitioner has overpaid its taxes for the year on that basis, and the extent of the overpayment, if any.

The petitioner points out that it has already had the benefit of an overassessment of $138,382.24 for the year 1920 by having that amount credited against an outstanding tax liability for 1922 and 1923. It then claims that the framers of the 1928 Act did not intend section 705 (a) (1) to apply under such circumstances as is shown by statements made when the section was discussed in Congress and by the use of the word " shall " in the section, but they intended it to apply only to future credits or refunds claimed after the enactment of the 1928 Act. Perhaps the framers of the act, if they had had in mind a situation such as is here presented, would have given the petitioners the benefit claimed, but the words they use do not admit of the interpretation sought to be placed upon them by the petitioners.

In the recomputation under Rule 50 the necessary adjustments with respect to the errors conceded by the respondent will be made.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

TRUSSELL dissents.