*An appropriate order will be entered.*

THE FIRST NATIONAL BANK OF GAINESVILLE, TRUSTEE, U/A CLARENCE O. BARKER, TRANSFEREE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 23697-83—23699-83.     Filed April 28, 1987.

*W. Woodrow Stewart* and *Steven A. Cornelison*, for the petitioners.

*Bonnie L. Cameron* and *Albert L. Sandlin*, for the respondent.

WHITAKER, *Judge*: Respondent determined petitioners to be liable, as transferees, for deficiencies in Federal income tax of Hall Paving Co., Inc., Transferor (Hall Paving), for

[1] Cases of the following petitioners were consolidated for trial, briefing, and opinion: The First National Bank of Gainesville, Trustee, U/A Hall Paving Co., Inc., Transferee, docket No. 23698-83; and The First National Bank of Gainesville, Trustee, U/A Roger H. Brown, Jr., Transferee, docket No. 23699-83.

the years and in the amounts indicated:

| TYE Oct. 31— | Deficiency[2] |
|---|---|
| 1978 | $197.04 |
| 1979 | 90,087.75 |

After concessions by petitioners, the issues presented for consideration are:

(1) Whether Hall Paving's inventory of soil aggregate was included within its election to adopt the Last-In, First-Out (LIFO) inventory method;

(2) Whether Hall Paving's writedown of soil aggregate constituted a change in accounting method;

(3) Whether Hall Paving is entitled to an ordinary business deduction for the purchase of 125 calculators.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner First National Bank of Gainesville as Trustee (First National) had its principal place of business in Gainesville, Georgia, at the time the petitions herein were filed. First National is a transferee as trustee of assets belonging to Hall Paving under separate agreements with Clarence O. Barker (Barker) and Roger H. Brown, Jr. (Brown). Barker and Brown were each one-third shareholders in Hall Paving during the years at issue.[4] Pursuant to said agreements, on January 14, 1980, Hall Paving distributed cash to First National in the following amounts:

a. $850,000, in trust, for the benefit of the children of Barker;

b. $850,000, in trust, for the benefit of the children of Brown;

c. $300,000, in trust, for the payment of unspecified contingent liabilities.

---

[2]Petitioners agreed to an additional assessment for the fiscal year ending Oct. 31, 1979, in the amount of $33,616.25.

[3]Petitioners concede on brief that the business purpose of additional entertainment, travel, and gift expenses was unsubstantiated.

[4]The record does not indicate the identity of the remaining one-third shareholder of Hall Paving.

Hall Paving received no consideration for said transfers, and was insolvent thereafter.

First National, through its duly authorized representative, executed and delivered to respondent transferee agreements on behalf of Hall Paving, Barker, and Brown. Pursuant to said agreements, First National, as trustee, agreed to pay any deficiencies in income tax for the fiscal years ending October 31, 1978, and October 31, 1979, together with interest thereon as provided by law, as may be finally determined or adjudged to be due from Hall Paving. By reason of the transfer of assets to First National, as trustee, First National is a transferee of assets within the meaning of section 6901.[5]

Hall Paving was incorporated under the laws of the State of Georgia on March 28, 1961, and had its principal place of business in Gainesville, Georgia. Hall Paving operated the Cumming and Friendship quarries, and had as its principal business activity the mining of nonmetallic minerals. The quarries contained biotite, granite, and quartzite which, when crushed, was referred to as aggregate.[6] Pure aggregate is used as the base or sub-base in the construction of roads, or is mixed with a mortar such as asphalt or concrete.

At the time Hall Paving commenced production of pure aggregate at the Cumming quarry, the bedrock was covered by an overburden of soil and broken stone.[7] To expose the bedrock, Hall Paving would drill through the soil, plant explosives, and blast the overburden. The resulting mixture of soil and aggregate was hauled to crushers and reduced to a uniform gradation of less than 1½ inches. The mixture of crushed soil and aggregate was referred to as "soil aggregate." The production of soil aggregate was a by-product of exposing the bedrock for the production of pure aggregate. Hall Paving would include in soil aggregate the minimum amount of crushed and broken stone necessary to make it a salable product.

---

[5]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[6]For purposes of this opinion, uncontaminated crushed and broken stone will be referred to as "pure aggregate."

[7]As the overburden grew deeper, Hall Paving had a subcontractor strip it away. It became more economical to waste the overburden then to attempt to produce salable soil aggregate.

Soil aggregate, like pure aggregate, was used by contractors working on Georgia Department of Transportation projects as both the base and sub-base underlying paved roads. With the occasional addition of a load of pure aggregate, Hall Paving's soil aggregate was uniformly sufficient to meet the applicable Georgia Department of Transportation specifications. Additionally, soil aggregate was sold to independent contractors for use in shopping center and subdivision developments. Hall Paving was producing and selling soil aggregate at a commercially viable rate through 1976.

Subsequent to 1976, however, the Cumming quarry discontinued the production of soil aggregate and had the overburden stripped away and discarded. Thereafter, the inventory of soil aggregate increased through the addition of contaminated aggregate rather than through the deliberate blasting and crushing of overburden. For the fiscal years ending October 31, 1978, and October 31, 1979, Hall Paving's total production and sales were as follows:

| FYE Oct. 31— | Total production[8] | Total sales |
|---|---|---|
| 1978 | 1,407,757 | $1,450,757 |
| 1979 | 1,613,434 | 1,629,434 |

For these same years, Hall Paving added 36,063 tons and 67,987 tons of contaminated aggregate to the existing stockpiles of soil aggregate and had sales of soil aggregate of $79,063 and $54,987. Thus, Hall Paving's sales of soil aggregate represented approximately 5.4 percent and 3.4 percent of total sales for the years 1978 and 1979, respectively.

Hall Paving had ending inventories of soil aggregate and pure aggregate for the years and in the amounts indicated:

| FYE Oct. 31— | Soil aggregate ending inventory | Pure aggregate ending inventory[9] |
|---|---|---|
| 1976 | 314,000 tons | 361,000 tons |
| 1977 | 241,000 tons | 333,000 tons |
| 1978 | 198,911 tons | 323,000 tons |
| 1979 | 211,000 tons | 294,000 tons |

---

[8]Hall Paving measured production by the ton.

[9]For the fiscal years ending Oct. 31, 1978, and Oct. 31, 1979, Hall Paving's ending inventory of pure aggregate reflected the inventories of both the Cumming and Friendship quarries.

As of its taxable year ending October 31, 1975, Hall Paving did not include the existing stockpile of soil aggregate in inventory. All costs associated with drilling, blasting, hauling, and crushing soil aggregate were allocated to pure aggregate in the year of production. Thus, as of this date, Hall Paving had no cost basis in its stockpile of soil aggregate. The cost of producing soil aggregate was recovered through the sale of pure aggregate. The subsequent stripping of overburden was treated as a leasehold improvement and amortized over a period of years.

For the taxable year ending October 31, 1976, Brown instructed Julius Williams (Williams), Hall Paving's controller, to include soil aggregate in inventory.[10] Hall Paving had been selling a considerable amount of soil aggregate up to this time, and Brown wanted to fairly represent the quarry's assets. Additionally, it was advantageous for Hall Paving to show a large inventory for bonding purposes. Consequently, the existing stockpile of soil aggregate was added to the ending inventory at $1 per ton, an amount Brown felt fairly represented the soil aggregate's value relative to the sand and pure aggregate in Hall Paving's inventory. There was no relationship between the cost of producing soil aggregate and the arbitrary market value of $1 attributed to it. At the time soil aggregate was included in inventory, it represented by volume approximately 47 percent of Hall Paving's total inventory. Through its fiscal year ending October 31, 1976, Hall Paving used the First-In, First Out (FIFO) inventory method and valued inventory at the lower of cost or market.[11]

Because Hall Paving had no cost basis in the soil aggregate, its inclusion in ending inventory resulted in a decrease in the cost of goods sold for 1976 and a corresponding increase in taxable income. The precise increase in Hall Paving's taxable income resulting from the inclusion of soil aggregate in inventory cannot be determined from the record.

For the years 1977 and 1978, $1 of Hall Paving's total production costs was allocated to each ton of contaminated

---

[10]As controller, Williams was responsible for maintaining Hall Paving's books, and preparing and filing Hall Paving's tax returns.

[11]Pursuant to sec. 1.471-2(c), Income Tax Regs., a taxpayer using the FIFO inventory method may value inventory at either cost or the lower of cost or market.

aggregate added to the soil aggregate. Thus, subsequent to the initial inclusion of soil aggregate in inventory, there was no additional material distortion of Hall Paving's ending inventory or cost of goods sold. For these same years, the cost per ton of producing pure aggregate was $2.29 and $2.17, respectively. The cost per ton of production was computed by dividing Hall Paving's adjusted costs by the tons of pure aggregate produced.

Hall Paving attached to its fiscal year ending October 31, 1977, tax return a Form 970 application to use LIFO inventory method. The election was prepared by Williams at Brown's direction to enable Hall Paving to deduct pure aggregate at its increased cost of production. Hall Paving reported an average cost basis of $1.75 per ton in its inventory of pure aggregate based upon the actual cost of production of pure aggregate on hand as of October 31, 1977. Hall Paving's actual cost per ton of production of pure aggregate for the years 1976 through 1979 was as follows:

| Year | Cost per ton |
| --- | --- |
| 1976 [12] | $1.85 |
| 1977 | 2.29 |
| 1978 | 2.17 |
| 1979 | 2.36 |

Soil aggregate continued to be included in inventory at the $1-per-ton value originally attributed to it. The Form 970 indicates that, as of the end of the immediately preceding taxable year, all inventory covered by the election was valued at cost. Contaminated aggregate subsequently added to the soil aggregate was consistently valued at $1 per ton, regardless of its actual cost of production.

On its Application to Use LIFO Inventory Method, Hall Paving's business was stated to be "Nonmetallic mining— Road Aggregate." The election was to apply to "All inventory of stone." No distinction was drawn on the Form 970 between the various grades of pure aggregate, soil aggregate, and sand in inventory at the time the election was made. Hall Paving listed "parts" and "repair" as goods subject to inventory that were not to be inventoried under

---

[12]For the year 1976, the cost per ton was computed as of June 1976, rather than the end of the fiscal year.

the LIFO method. The application indicated that credit statements or reports had been issued to "various lending institutions" and that the LIFO inventory method had been used in determining income, profit, or loss in these statements. The cost system used was stated to be the cost per ton of production.

On both its 1978 and 1979 returns, Hall Paving indicated that, in computing its cost of goods sold, 100 percent of its closing inventory was computed under the LIFO method. The returns indicated, however, that the valuation method used for the total closing inventory was the lower of cost or market.[13] Notations made by Williams on Hall Paving's monthly production, sales, and inventory records indicate that the LIFO method was being applied to all inventory.

A significant portion of Hall Paving's sales of soil aggregate was made to contractors working on State or county road projects. The Georgia Department of Transportation issued specifications for the soil aggregate used in these projects. Until October 1978, Hall Paving's soil aggregate met the Georgia Department of Transportation's standard specifications. On October 4, 1978, the specifications were modified for selected projects on a test basis, although Brown was aware of the proposed modifications prior to this time.[14] On June 4, 1979, Francis L. Canup (Canup), the Gainesville district engineer, notified all producers of soil aggregate that the modified specifications would be applied to all Georgia Department of Transportation projects contracted thereafter.

The modifications were necessitated by problems associated with the binding properties of soil aggregate. The modified specifications reduced the allowable volume change in the soil aggregate from 18 percent to 15 percent, and required the presence of a certain amount of clay. Hall Paving's soil aggregate did not have the clay content necessary to meet the modified specifications. Consequently, Hall Paving's soil aggregate could not be used on the

---

[13]Use of the lower of cost or market valuation method is inconsistent with a LIFO election. Sec. 1.472-2(b), Income Tax Regs., provides that inventory subject to a LIFO election shall be valued at cost regardless of market value.

[14]The Oct. 4, 1978, modification used the term "soil aggregate" in describing the mixture of soil and aggregate at issue, while prior to this time it was referred to as "impervious aggregate."

selected projects contracted subsequent to the October 4, 1978, notice, and could not be used on any projects contracted subsequent to June 4, 1979. The modifications applied to all projects undertaken for the Georgia Department of Transportation or for cities and counties participating in State aid projects. To comply with the modified specifications, it would have been necessary for Hall Paving to remove silt from its soil aggregate and add a considerable amount of clay. Brown made numerous attempts to salvage the existing inventory of soil aggregate, but was unable to devise any economical method of doing so. Nonetheless, Hall Paving was able to continue selling significant quantities of soil aggregate through 1979 to be used on projects contracted prior to the adoption of the modified specifications.

During its fiscal year ending October 31, 1979, Hall Paving entered into negotiations to sell a portion of its assets to the Georgia Marble Co. (Georgia Marble). On October 29, 1979, Hall Paving held a meeting of the stockholders and board of directors, wherein it was decided that the sale to Georgia Marble would be completed and that Hall Paving would be dissolved. The sale was consummated on December 20, 1979, and Hall Paving was completely liquidated subsequent to the January 14, 1980, transfer of assets to First National.[15]

Brown conducted negotiations with Georgia Marble on behalf of Hall Paving. It was during these negotiations that Brown became aware of the discrepancy between the book value and the market value of soil aggregate resulting from the change in Department of Transportation specifications. Georgia Marble agreed to pay Hall Paving book value for the pure aggregate, but was unwilling to pay anything for the soil aggregate. Nonetheless, the soil aggregate was included in the inventory ultimately sold to Georgia Marble.

W. Royce Petty (Petty) was Division Manager of Georgia Marble's Aggregate Group during 1979. Petty was Georgia Marble's main negotiator for the purchase of Hall Paving's assets and considered the soil aggregate to be of no value. Georgia Marble classified the soil aggregate as a waste

---

[15]A portion of the cash distributed in trust on Jan. 14, 1980, was received from the sale of assets to Georgia Marble.

product or fill material because it failed to meet any of Georgia Marble's specifications. Georgia Marble's product liability code precluded classification of soil aggregate as a pure aggregate or as a stone. Georgia Marble sold some of Hall Paving's soil aggregate for use in the construction of driveways and as fill dirt, but it has not been used in the construction of paved roads subsequent to the Georgia Department of Transportation's adoption of the modified specifications.

On its fiscal year ending October 31, 1979, tax return, Hall Paving wrote down the inventory value of its soil aggregate from $1 per ton to $0.10 per ton. The reduction in ending inventory value for 1979 caused Hall Paving's costs of goods sold to increase for the year, and consequently reduced its taxable income. Brown was aware of the proposed modifications in soil aggregate specifications during 1978, but it was his negotiations with Georgia Marble that dramatized the change in value. Additionally, the modified specifications did not have uniform prospective application until the publication of Canup's letter on June 4, 1979. Brown wanted to keep the soil aggregate in inventory as a means of monitoring the quantity on hand in the event that he needed to use it as fill or waste.

Williams prepared and attached a statement to Hall Paving's 1979 return explaining the adjustment to inventory. In the explanation, Williams stated that there was no longer a market for Hall Paving's soil aggregate because of the modified specifications. Additionally, he indicated that Hall Paving had no cost basis in the soil aggregate when it was included in inventory and that the $1-per-ton value placed on the soil aggregate had been arbitrary.

On its fiscal year ending October 31, 1978, tax return, Hall Paving claimed a deduction for travel and entertainment expenses in the amount of $2,082.41. Included in this deduction was $1,230 for 125 Sharp calculators purchased by Hall Paving from Sun Television & Appliance on November 27, 1978.

## OPINION

The first issue for decision is whether soil aggregate was included within Hall Paving's election to adopt the LIFO

inventory method. Petitioners contend that soil aggregate was not included within Hall Paving's election, while respondent contends that it was.

Petitioners maintain that Hall Paving's principal business was the production and sale of pure aggregate, and that the LIFO election was made to .allow for the deduction of pure aggregate at its increased cost of production. Conversely, the production of soil aggregate was merely a by-product of producing pure aggregate. No soil aggregate was deliberately produced during the years in issue, and any increase in inventory resulted from the addition of contaminated aggregate to existing stockpiles. Furthermore, the sale of soil aggregate represented only 5.4 percent and 3.4 percent of Hall Paving's total sales during 1978 and 1979, respectively.

Petitioners stress the facts that soil aggregate was included in Hall Paving's inventory at an arbitrary market value of $1 per ton. There was no attempt to correlate the inventory value of soil aggregate with its actual cost of production. All costs associated with the production of soil aggregate had been allocated to pure aggregate. The contaminated aggregate added to existing stockpiles of soil aggregate was included in inventory at $1 per ton, regardless of the actual cost of production. Consequently, there was no increase in the inventory value of soil aggregate to be recouped through a LIFO election. Soil aggregate was originally included in inventory to monitor the quantities available and to enhance the balance sheet.

Finally, petitioners note that section 1.472-2(a), Income Tax Regs., requires that a taxpayer electing the LIFO inventory method specify "with particularity" the goods to which the election is to apply. In completing the Application to Use LIFO Inventory Method, Hall Paving indicated that the election was to apply to "All inventory of stone." Petitioners argue that the word "stone" as used in the construction and mining industries includes pure aggregate but does not include soil aggregate. Thus, petitioners maintain that the specificity requirements were satisfied and that the facts require a finding that soil aggregate was not included within the LIFO election.

Respondent contends that soil aggregate was included within Hall Paving's election to adopt the LIFO inventory method. First, respondent points to the Form 970, Application to Use LIFO Inventory Method. On the Form 970, Hall Paving indicated that the election was to apply to "All inventory of stone." In listing goods subject to inventory which were not to be inventoried under the LIFO method, Hall Paving listed "parts" and "repair." Respondent insists that soil aggregate cannot be considered either "parts" or "repair," and consequently must be included within the category of "stone." Furthermore, soil aggregate represented 47 percent of Hall Paving's inventory at the time the LIFO election was made. To omit soil aggregate from both the category of goods included in, and excluded from, the LIFO election would leave 47 percent of Hall Paving's inventory unaccounted for.

Respondent also cites section 1.472-2(a), Income Tax Regs., as requiring Hall Paving to specify "with particularity" the goods to which the election was to apply. Respondent contends, however, that Hall Paving's use of the word "stone" is ambiguous, and that petitioners must bear the burden of that ambiguity. Williams and Brown were familiar with the different grades of sand and aggregate in Hall Paving's inventory, but made no attempt to differentiate between them in completing the Form 970. Petitioners maintain that pure aggregate constitutes "stone," and that soil aggregate does not; subsequent to 1976, however, the inventory of soil aggregate grew through the addition of contaminated pure aggregate. Thus, respondent argues, Hall Paving failed to differentiate sufficiently between the different grades of aggregate, and the word "stone" must be given an expansive reading to compensate for the ambiguity resulting from Hall Paving's lack of specificity.

Finally, respondent points to Hall Paving's 1978 and 1979 corporate income tax returns and monthly production, sales, and inventory records. Under Schedule A "Cost of Goods Sold," the corporate returns indicate that 100 percent of Hall Paving's inventory was computed on the LIFO method. Similarly, the monthly production, sales, and inventory records have notations made by Williams in the margin indicating that both pure and soil aggregate were invento-

ried on the LIFO method. Respondent recognizes that corporate returns and records do not change the election itself, but offer corroborating evidence as to Williams' intentions at the time the Form 970 was filed.

We decide this issue for respondent, and hold that soil aggregate was included within Hall Paving's election to adopt the LIFO inventory method. Hall Paving failed to complete the Form 970 with the specificity necessary to differentiate between the different grades of aggregate. Though "stone" may not technically include soil aggregate for purposes of the construction and mining industries, it is clear that soil aggregate is neither "parts" nor a "repair." Thus, the Form 970 requires us to read the word "stone" expansively. Furthermore, Hall Paving's corporate returns and production, sales, and inventory records substantiate our determination that soil aggregate was included within the election. Based upon the ambiguity resulting from Hall Paving's lack of specificity, and our reluctance to omit 47 percent of Hall Paving's inventory from items either included in, or excluded from, the election, we hold that "stone" includes soil aggregate.

Having decided that soil aggregate was included within the LIFO election, the next issue for decision is whether Hall Paving's writedown of soil aggregate constitutes the mere correction of an accounting error or a change in accounting method. Petitioners contend that the writedown was merely the correction of its error of including the soil aggregate in ending inventory at $1 per ton in 1976. This erroneous inclusion resulted in an overstatement of ending inventory, an understatement of cost of goods sold, and an overstatement of taxable income for the year of inclusion. Respondent contends that the writedown constituted a change in accounting method pursuant to section 472(e), and therefore requires the consent of the Secretary.

Pursuant to section 446(a), a taxpayer is required to compute his taxable income using the method of accounting under which he regularly computes his income in keeping his books.[16] The term "method of accounting" denotes not

---

[16]SEC. 446. GENERAL RULES FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

only the taxpayer's overall method of accounting, but also the treatment of any material item, such as inventory. Sec. 1.446-1(a)(1), Income Tax Regs. Section 446(b) provides that where the method of accounting regularly utilized by the taxpayer does not clearly reflect taxable income, the computation of taxable income shall be made under such method as, in the Commissioner's opinion, does clearly reflect income.

The use of inventories is governed by section 471 and the regulations thereunder. Section 471 provides that inventories shall be taken whenever, in the opinion of the Commissioner, the use of inventories is necessary in order to clearly determine the income of any taxpayer.[17] The taking of inventories is to be on such basis as the Commissioner may prescribe as conforming to the best accounting practice in the trade or business and as most clearly reflecting income.[18]

It is well established that section 446(b) and section 471 vest the Commissioner with broad authority in matters of inventory accounting and give him wide latitude to adjust accounting methods so as to clearly reflect income. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532 (1979); *United States v. Catto*, 384 U.S. 102, 113-114 (1966); *Superior Coach of Florida, Inc. v. Commissioner*, 80 T.C. 895, 909 (1983); *Primo Pants Co. v. Commissioner*, 78 T.C. 705, 719-720 (1982). These provisions, by their express language and long-standing existence, have been interpreted as imposing a heavy burden of proof on a taxpayer disputing respondent's determination with respect to accounting matters. *Thor Power Tool Co. v. Commissioner, supra* at 532-533. In such matters, respondent's determina-

---

[17]The regulations provide that "inventories * * * are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor." (Sec. 1.471-1, Income Tax Regs.)

[18]The inventory method of miners and manufacturers is specifically addressed in sec. 1.471-7, Income Tax Regs., which provides as follows:

A taxpayer engaged in mining or manufacturing who by a single process or uniform series of processes derives a product of two or more kinds, sizes, or grades, the unit cost of which is substantially alike, and who in conformity to a recognized trade practice allocates an amount of cost to each kind, size, or grade of product, which in the aggregate will absorb the total cost of production, may, with the consent of the Commissioner, use such allocated cost as a basis for pricing inventories, provided such allocation bears a reasonable relation to the respective selling values of the different kinds, sizes, or grades of product. See section 472 as to last-in, first out inventories.

tion is not to be set aside unless it is shown to be plainly arbitrary or an abuse of discretion. *Lucas v. Kansas City Structural Steel Co.*, 281 U.S. 264, 271 (1930); *Baird v. Commissioner*, 68 T.C. 115, 131 (1977).

Section 472(a)[19] allows a taxpayer who is either required or permitted to maintain inventories the option of valuing inventories under the LIFO method. The LIFO method is based on the accounting convention that the goods purchased last are deemed to be the first goods sold and that ending inventories are deemed to be composed of the earliest purchased goods. The theory justifying the LIFO method is generally that the determination of income may be more accurate by matching current costs with current revenues, thereby eliminating from income any inflation-induced and therefore artificial profit. *Peninsula Steel Products & Equipment Co. v. Commissioner*, 78 T.C. 1029, 1054 (1982); *Fox Chevrolet, Inc. (Maryland) v. Commissioner*, 76 T.C. 708, 723 (1981).

Hall Paving elected to use the LIFO inventory method at the time of filing its income tax return for the fiscal year ended October 31, 1977. An initial election of LIFO is a change in accounting method. Sec. 1.446-1(e)(2)(i), Income Tax Regs. Where a taxpayer properly elects the LIFO inventory method, the taxpayer is excepted from the prior consent requirement of section 446(e), which is generally applicable to changes in accounting method, and is, instead, subject to the requirements governing the election under section 472. *John Wanamaker Philadelphia, Inc. v. United States*, 175 Ct. Cl. 169, 175, 359 F.2d 437, 440 (1966); *Peninsula Steel Products & Equipment Co. v. Commissioner, supra* at 1055; *Reco Industries, Inc. v. Commissioner*, 83 T.C. 912, 929 (1984). Any change to, and use of, the LIFO inventory method must be in accordance with applicable regulations to ensure that the use of such method clearly reflects income.

---

[19]SEC. 472. LAST-IN, FIRST-OUT INVENTORIES.

(a) AUTHORIZATION.—A taxpayer may use the method provided in subsection (b) (whether or not such method has been prescribed under section 471) in inventorying goods specified in an application to use such method filed at such time and in such manner as the Secretary may prescribe. The change to, and the use of, such method shall be in accordance with such regulations as the Secretary may prescribe as necessary in order that the use of such method may clearly reflect income.

A taxpayer who utilizes the LIFO method must value his inventory at cost rather than at the lower of cost or market. Sec. 472(b); sec. 1.472-2(b), Income Tax Regs. The actual cost of inventory is determined pursuant to section 1.472-2(c), Income Tax Regs., which provides in part as follows:

The actual cost of the aggregate shall be determined pursuant to the inventory method employed by the taxpayer under the regulations applicable to the prior taxable year with the exception that restoration shall be made with respect to any write-down to market values resulting from the pricing of former inventories.

In valuing inventory on hand at the beginning of a taxable year, section 1.471-3(a), Income Tax Regs., provides that cost means the inventory price of such goods. The requirement that opening inventory coincide with the prior year's closing inventory conforms with the consistency requirements necessary to clearly reflect income. Sec. 1.446-1(a)(2), Income Tax Regs. Similarly, in determining income for the taxable year preceding the year of transition, section 472(d) requires that the corresponding closing inventory must reflect the subsequent restoration of prior writedowns.[20] The inclusion of writedowns in the prior year's ending inventory avoids the possibility of allowing a double deduction.

Finally, pursuant to section 472(e), a taxpayer who has elected the LIFO inventory method must use such method in all subsequent years unless a change to a different method is authorized by the Secretary.[21] Such authorization is obtained pursuant to a written application filed as provided in section 1.446-1(e), Income Tax Regs. See sec. 1.472-5, Income Tax Regs.

It is respondent's contention that Hall Paving's writedown of soil aggregate constitutes a change in accounting method pursuant to section 472(e)(1) requiring the

---

[20]Sec. 472.

SEC. 472(d). PRECEDING CLOSING INVENTORY.—In determining income for the taxable year preceding the taxable year for which the method described in subsection (b) is first used, the closing inventory of such preceding year of the goods specified in the application referred to in subsection (a) shall be at cost.

[21]Sec. 472.

SEC. 472(e). SUBSEQUENT INVENTORIES.—If a taxpayer, having complied with subsection (a), uses the method described in subsection (b) for any taxable year, then such method shall be used in all subsequent taxable years unless—

(1) with the approval of the Secretary a change to a different method is authorized; * * *

Secretary's authorization pursuant to section 1.446-1(e), Income Tax Regs. Petitioners dispute this contention, maintaining that the writedown was merely the correction of an accounting error necessary to include the soil aggregate in inventory at cost. We decide this issue for respondent.

A taxpayer's adoption and use of the LIFO inventory method requires that specified goods be included in inventory at cost regardless of market value. Sec. 472(b)(2); sec. 1.472-(2)(b), Income Tax Regs. The actual cost of goods is determined pursuant to the inventory method employed by the taxpayer under the regulations applicable to the prior taxable year. The cost of goods on hand at the beginning of the taxable year is the prior year's ending inventory price. Sec. 1.471-3(a), Income Tax Regs. An exception to this carryover of valuation methods requires the restoration of any writedown to market value resulting from the pricing of former inventories. Sec. 1.472-2(c), Income Tax Regs. Prior to making the LIFO election, Hall Paving used the LIFO inventory method, but made no writedown of soil aggregate as either normal or subnormal goods. On its Form 970, Application to Use LIFO Inventory Method, Hall Paving indicated that the closing inventory of goods covered by the election at the end of the immediately preceding taxable year was valued at cost, as required by section 472(d). Additionally, the application states that no adjustment to the prior year's income was required as a result of electing the LIFO inventory method. Thus, for purposes of section 472(b), Hall Paving's "actual cost" for the soil aggregate was its cost as determined at the close of the prior taxable year.

Hall Paving's subsequent attempt to write down soil aggregate to $0.10 a ton constitutes a change in accounting method requiring the Secretary's authorization as described in section 472(e). No such authorization was obtained and the writedown must be disallowed accordingly. To hold otherwise would infringe upon the authority expressly vested in the Secretary pursuant to sections 446, 471, and 472. Additionally, consistency in accounting methods within and between taxable years is a prerequisite to the clear reflection of income. Sec. 1.446-1(a)(2), Income Tax Regs.

Thus, respondent's disallowance of the writedown does not constitute an abuse of discretion and is sustained accordingly.

We recognize that an accounting error was made at the time the soil aggregate was included in inventory in 1976. This error was subsequently incorporated into the valuation of soil aggregate at the time the LIFO election was made. It is axiomatic, however, that a taxpayer's taxable income is computed on the basis of the taxpayer's taxable year. Sec. 441(a). Thus, Hall Paving's proper recourse was to file an amended return for 1976 and all subsequent years, showing correct valuations for both the soil aggregate and pure aggregate.[22] Alternatively, subject to the approval of the Secretary, Hall Paving could have requested adjustments to the inventory value of soil aggregate at the time there was a change in accounting method pursuant to the LIFO election.[23] Neither of these corrective measures was taken, however, and the statute of limitations now bars adjustments to years prior to those at issue. Though the writedown of soil aggregate in 1979 may have constituted the correction of an error, it also constituted a change of accounting method pursuant to section 472(e). Where the correction of an error results in a change in accounting method, the requirements of section 446(e) are applicable. *Fruehauf Trailer Co. v. Commissioner*, 42 T.C. 83 (1964), affd. 356 F.2d 975 (6th Cir. 1966), cert. denied 385 U.S. 822 (1966); *Superior Coach of Florida, Inc. v. Commissioner*, 80 T.C. 895 (1983); *Primo Pants Co. v. Commissioner*, 78 T.C. 705 (1982).

The last issue for decision is whether Hall Paving is entitled to an ordinary business deduction for the purchase of 125 calculators. Petitioners offered no evidence to substantiate these deductions. On brief, petitioners argued that

[22]Under specified circumstances, the mitigation provisions of sec. 1311 et seq. operate to lift the statute of limitations as a bar to adjustment. Neither party has argued the applicability of these provisions on the facts before us.

[23]Sec. 1.472-4, Income Tax Regs. Adjustments to be made by taxpayer.

A taxpayer may not change to the LIFO method of taking inventories unless, at the time he files his application for the adoption of such method, he agrees to such adjustments incident to the change to or from such method, or incident to the use of such method, in the inventories of prior taxable years or otherwise, as the district director upon the examination of the taxpayer's returns may deem necessary in order that the true income of the taxpayer will be clearly reflected for the years involved.

the calculators were purchased during the Christmas season and that there would be no reason to purchase 125 calculators other than as business gifts. Respondent acknowledges that expenditures for business gifts may qualify as ordinary and necessary business expenses pursuant to section 162(a), but claims that petitioners have failed to meet the substantiation requirements of section 274(d) and the regulations thereunder.

The substantiation requirements of section 274(d) and section 1.274-5(b), Income Tax Regs., require petitioners to value the gift, demonstrate a business purpose, and describe the business relationship of the taxpayer to each individual receiving the gift. Such substantiation must be done through adequate records or sufficient corroborating evidence. Petitioners have provided neither records nor corroborating evidence of any kind. We do not even have the benefit of Brown's testimony as to the circumstances surrounding the purchase and distribution of the calculators. A stipulation as to the number of calculators purchased, and to the date of purchase, falls woefully short of meeting petitioners' burden of proof. Rule 142(a). Consequently, we decide the issue for respondent.

*Decisions will be entered for the respondent.*