WAYNE BOLT AND NUT COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9236-87.        Filed October 23, 1989.

*Robert F. Forrest, George J. Haddad,* and *Joseph F. Dillon,* for the petitioner.

*Margaret A. Satko,* for the respondent.

RUWE, *Judge:* Respondent determined a deficiency of $1,091,362 in petitioner's Federal income tax for the taxable year ended February 28, 1982. The issues for decision are whether petitioner correctly valued its opening inventory and, if so, whether petitioner changed its method of accounting so as to require adjustments pursuant to section 481.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner, a Michigan corporation, is engaged in the business of selling metal fasteners. Petitioner's principal place of business was in Detroit, Michigan, when the petition was filed in this case.

Petitioner sells approximately 50,000 different types of bolts, nuts, and other fasteners. Petitioner sells standard fasteners, which are listed in a catalog published by the metal fastener industry and are items of general usage, and "specialty items," which are fasteners designed to fit the specific needs of a particular customer or for use in a particular product.

Petitioner files its Federal income tax returns on a fiscal year basis with its fiscal year ending February 28. Petitioner uses the accrual method of accounting and values its inventory at the "lower of cost or market."

Petitioner's main warehouse, the Wayne Division, is located in Detroit, Michigan, and its second smaller warehouse, the Warren Division, is located in Warren, Michigan. Petitioner moved into the main warehouse in 1974. The main warehouse is an old building containing approximately 70,000 square feet of floor space. The building was constructed in 1928, and an addition was made to the rear of the building in 1960. The warehouse portion of the building is divided into eight bays, with an office across the front.

In the older portion of the main warehouse, fasteners were placed in cartons, containers, casks, and other boxes, and were stacked on wooden pallets on the floor or in large wooden and metal bins. In the other rooms, casks or boxes of fasteners were placed on pallets, and the pallets were

stacked on shelves six levels high. Petitioner's inventory was disorganized in that identical types of fasteners were stored in different areas of the main warehouse. Inventory was often lost or misplaced.

Petitioner acquired large fasteners from its Giant Bolt and Nut Division. With the exception of those products manufactured by its Giant Bolt and Nut Division, all the fasteners acquired by petitioner were purchased. Petitioner purchased fasteners directly from a manufacturer or as part of "odd lots" or surplus merchandise.

Since the date of its incorporation on April 3, 1959, petitioner has maintained a perpetual book inventory record keeping system which it utilizes to determine the amount of its inventory. An inventory card was prepared and maintained for each type of fastener petitioner purchased. There are approximately 70,000 inventory cards in either an active or inactive inventory file at petitioner's two warehouses. The inventory cards maintained in the inactive inventory file are for items which have been fully disposed of or items considered to be inactive. Petitioner does not destroy any of its inventory cards. The Wayne Division and the Warren Division maintain their own separate perpetual book inventory record keeping system in the same manner.

When petitioner purchased fasteners from a manufacturer, petitioner's procedure was to prepare an inventory card when it received an initial order from a manufacturer of a particular type of fastener, and to include on the inventory card a description of the fastener, the name of the supplier, the quantity received, the date it was received, its cost, and its location in the warehouse. For repetitive orders of the same type of fastener, petitioner made additional entries on the same card showing the quantity received, its cost, and the name of the supplier.

When petitioner purchased fasteners as part of "odd lots" or surplus merchandise, petitioner's procedure was to prepare "breakdown sheets" indicating the type of merchandise, its size, condition, finish, the quantity, the location at which the merchandise was to be stored, and the price paid per pound for the merchandise. It could take petitioner as much as 2 years to examine and break down the surplus merchandise and to prepare breakdown sheets. Once break-

down sheets were prepared, they were then to be forwarded to the office for the preparation of inventory cards.

When petitioner shipped merchandise to a customer, petitioner's procedure called for the shipping department to prepare a shipping document containing a description of the fastener and the quantity shipped. The shipping document was to be sent to the office so that an entry could be made on the inventory card indicating the quantity shipped, the balance remaining, and the location of the unshipped items. After an order was filled in the shipping department, the box or keg from which the items were taken was not necessarily returned to the original location as noted on the inventory card.

Purchases and sales were not always recorded accurately or promptly on the inventory cards. In some instances, the inventory cards reflected quantity on hand but not cost. Inventory cards were not prepared for all items.

Each year prior to 1982, petitioner's General Manager, Joseph Luranc, verified inventory by randomly selecting approximately 300 of its 70,000 inventory cards and comparing the quantity listed on the inventory card with the quantity found at the location specified on the inventory card. If Mr. Luranc could not find the inventory at its specified location, he made no attempt to find "missing inventory" at a location other than the location listed on the inventory card. The balance on these 300 selected inventory cards was adjusted downward or upward in accordance with the quantity actually found in stock. The downward and upward adjustments were sent to petitioner's accountant who adjusted petitioner's ending inventory accordingly.

Petitioner's perpetual book inventory record keeping system showed inventory with a value of $268,681 as of March 1, 1981, the beginning of the taxable year in issue. This amount was the same amount petitioner had reported as ending inventory on its original income tax return for the prior fiscal year ending February 28, 1981.[2]

---

[2]As reflected on petitioner's original income tax return filed for the year in issue, the opening inventory included the value of Giant Bolt Division—Finished Goods, in the amount of $5,368; Giant Bolt Division—Work in Process, in the amount of $18,425; and Giant Division—Raw Materials, Steel, in the amount of $35,176.69.

Between March and October 1982, petitioner undertook its first complete physical inventory of all items located in its warehouses. Rather than physically count each item, petitioner utilized an electronic scale to determine the weight and count of a particular type of fastener in a container. Petitioner prepared an inventory tag for each item in stock. The inventory tags were then forwarded to the office for comparison with the inventory cards on file. When an inventory tag showed that the quantity of an item in stock was greater than the quantity listed on the inventory card, petitioner adjusted the quantity listed on the card upward. In numerous instances, an item was found in stock for which the inventory card showed a zero balance. When the quantity of an item in stock exceeded the quantity listed on the inventory card, and the item had been purchased over a period of more than 1 year, petitioner estimated the cost of the item when valuing the inventory.

In many instances, an item was found during the complete physical inventory for which no inventory card existed. In such a situation, petitioner established a new inventory card and entered the quantity of the item found in the warehouse. Petitioner estimated the cost of items for which no inventory card existed based on prices listed in a 1982 catalog published by the metal fastener industry.

Petitioner completed the physical inventory in October 1982. Based on the physical inventory, petitioner prepared a schedule of inventory listing a description of each item, its quantity, its cost, and the cost of the quantity on hand. Using this schedule of inventory, petitioner calculated its ending inventory for the fiscal year ended February 28, 1982, by making adjustments for purchases and sales which occurred between the end of the fiscal year and the date of the physical inventory. In preparation for trial, petitioner rechecked the entries on the schedule with the amounts stated on the inventory cards, and made the appropriate corrections where the quantity, price, or total differed.

Based on the complete physical inventory, petitioner also determined that opening inventory for fiscal year ended

---

The closing inventory for the year in issue as reflected on the original return included the value of Giant Bolt Division—Work in Process, in the amount of $24,633 and Giant Division—Raw Materials, Steel, in the amount of $47,935.03. The value of Giant Bolt Division—Finished Goods, was included in the Wayne Division inventory.

February 28, 1982, was $2,642,520.85.[3] Petitioner determined the quantity of items in opening inventory by taking the quantity of items found on the actual inventory date, adding to that the quantity sold between March 1, 1981, and the actual inventory date, and subtracting from that figure the quantity purchased between March 1, 1981, and the actual inventory date. Petitioner's method of computing inventory assumes that purchases and sales between March 1, 1981, and the date of the actual physical inventory were correctly stated on the inventory cards.

The complete physical inventory finished in October 1982 and the reconstruction of opening inventory as of March 1, 1981, which was based on the complete physical inventory, indicate that the quantity of items reflected in petitioner's book inventory on March 1, 1981, was substantially understated.

Petitioner also recomputed inventory as of February 29, 1980, and February 28, 1979, using the same method it used to recompute inventory as of March 1, 1981, and filed amended returns for its fiscal years ending in February 1979, 1980, and 1981, using the recomputed opening and ending inventory figures. These amended returns indicate that most of the understatements of inventory discovered in 1982 had been made in years prior to taxable year ending February 28, 1979. It is petitioner's position that years prior to the one ending February 28, 1979, were closed by the statute of limitations when the amended returns were filed.

## OPINION

Respondent determined that petitioner's opening inventory for fiscal year ended February 28, 1982, was $268,681, based on petitioner's book inventory. Petitioner reported this amount as ending inventory on its original return filed for fiscal year ended February 28, 1981. Based on information obtained from a complete physical inventory conducted

---

[3]On petitioner's return for the taxable year in issue, it reported opening inventory of $2,640,114. Petitioner argued at trial and on brief, based on a reverification of physical inventory in preparation for trial, that the correct figure for opening inventory during the year in issue is $2,642,520.85.

in 1982, petitioner contends that actual opening inventory on March 1, 1981, was $2,642,520.85.

Respondent also argues that if we find that petitioner has proven opening inventory as reported on its return, section 481[4] will nevertheless require an adjustment to prevent petitioner from reaping the benefit of its change in accounting method. Respondent has not questioned the accuracy of petitioner's reconstruction of ending inventory as of February 28, 1982, even though ending inventory was reconstructed in the same way and based upon the same physical inventory.

If, as respondent argues, petitioner has changed its method of accounting for inventory, it would be inappropriate to determine ending inventory under the new method while using the old method of accounting to determine opening inventory. It is well settled that opening and ending inventory must be computed pursuant to the same method. *Superior Coach of Florida v. Commissioner*, 80 T.C. 895, 911 (1983); *Primo Pants Co. v. Commissioner*, 78 T.C. 705, 725 (1982); *Dearborn Gage Co. v. Commissioner*, 48 T.C. 190, 197 (1967); *Fruehauf Trailer Co. v. Commissioner*, 42 T.C. 83, 107 (1964), affd. 356 F.2d 975 (6th Cir. 1966).

If we accept respondent's position that petitioner changed its method of accounting, the proper mechanism for preventing duplications of expenses or omissions of income is embodied in section 481. For this reason we will first determine whether petitioner did in fact change its method of accounting. We note that the total dollar adjustment to income is the same under either of respondent's positions although the amount of the deficiency might vary because of the limitations contained in section 481(b).

Respondent first raised the issue of whether petitioner changed its method of accounting in his amended answer. We will preliminarily address the question of which party bears the burden of proof on this issue.

---

[4]Sec. 481(a) provides, in pertinent part:

SEC. 481(a). GENERAL RULE —In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted * * *.

Generally, the burden of proof is on the taxpayer. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111 (1933). Respondent bears the burden of proof, however, with "respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in his answer * * * ." Rule 142(a).

A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence. *Colonnade Condominium, Inc. v. Commissioner,* 91 T.C. 793, 795 n. 3 (1988); *Achiro v. Commissioner,* 77 T.C. 881, 890-891 (1981). A new theory which merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof. *Achiro v. Commissioner, supra* at 890; *Estate of Jayne v. Commissioner,* 61 T.C. 744, 748-749 (1974); *McSpadden v. Commissioner,* 50 T.C. 478, 492-493 (1968).

In his deficiency notice, respondent determined that the value of petitioner's opening inventory was $268,681, rather than $2,640,114 as reported on petitioner's return. Respondent increased petitioner's taxable income by $2,371,433. On February 24, 1988, respondent filed a motion for leave to file first amendment to answer, requesting that the Court allow him to amend his answer to allege that petitioner changed its method of accounting requiring a section 481 adjustment. We granted the motion. We directed the parties to argue on brief whether respondent bore the burden of proof on this issue.

The evidence required to establish the amount of actual opening inventory is different from the evidence required to establish that no accounting method change occurred during the year in issue. To prove opening inventory on March 1, 1981, petitioner would have to produce evidence of the quantity and cost (or market value if lower) of inventory on that date. Proof that petitioner's opening inventory figure was correct would not necessarily lead to the conclusion that there was no accounting method change. In order to establish that no accounting method change occurred, petitioner would have to present evidence that its method for determining inventory for March 1, 1981, and for prior years was the same. A finding that there was an accounting method change requiring a section 481 adjustment could

also require evidence of taxable income for prior years and could alter the amount of the deficiency. Sec. 481(b). The accounting method issue is therefore a new matter. It follows that the burden of proving that there was a change in accounting method is on the respondent. Rule 142(a).

We are convinced that petitioner's pre-1982 method of determining inventory was seriously flawed and resulted in the premature write-down of inventory. Petitioner's manager testified to the disorganized state of petitioner's warehouse. Rather than storing items of inventory in specific places by category, petitioner would allow packages of identical items to become separated and misplaced in its warehouse. Nevertheless, prior to 1982, it was petitioner's practice to check its book inventory by physically verifying about 300 items of inventory every year. Petitioner's employees would look for the items in the location shown on the inventory cards. However, if the items could not be found in that location, petitioner's employees would look no further. Rather, petitioner would simply write off the unfound items. It is apparent that many of the items found in the complete physical inventory taken in 1982 had been written off in prior years pursuant to this practice. The result of such write-offs in prior years would have been to increase costs of goods sold and, thus, reduce reported income for those years.[5]

There were obviously other systemic flaws in petitioner's method of accounting for inventory prior to 1982. Petitioner never destroyed inventory cards, even when an item became inactive. However, the complete physical inventory conducted in 1982 revealed many inventory items for which there were no inventory cards.

Petitioner purchased "odd lots" or surplus merchandise. Under petitioner's pre-1982 system, it could take several years to record such purchases on inventory cards. It is obvious that the failure to reflect such purchases on inventory cards as part of ending inventory would result in inflating cost of goods sold and reducing income in the year of the purchase.

---

[5]Gross income is determined by subtracting cost of goods sold from gross sales. Cost of goods sold is computed by adding purchases (additions to inventory) to opening inventory, and then subtracting closing inventory.

During the physical inventory, inventory cards were found on which no cost figures had been recorded. In these instances petitioner estimated the cost for purposes of the 1982 inventory valuation, often using current costs. This was a departure from petitioner's method of valuing inventory at the lower of cost or market.

If petitioner had continued to use its pre-1982 system, the system would have automatically self-corrected since each year's ending inventory becomes the opening inventory for the succeeding year. *Primo Pants Co. v. Commissioner, supra* at 723. When items whose cost had been written off in previous years were sold, petitioner would have had lower costs of goods sold and corresponding increases in gross income. As we stated in *Primo Pants Co.:*

Because we are here dealing with inventory, where one year's closing inventory becomes the next year's opening inventory, we are satisfied that the present case involves only postponement of income and therefore involves a timing question.

The consistent undervaluation of ending inventory acts to defer income. Section 1.61-3(a), Income Tax Regs., provides that "In a manufacturing, merchandising, or mining business, 'gross income' means the total sales, less the cost of goods sold." Petitioner, as a manufacturer of men's pants, computes its income from sales by subtracting cost of goods sold from gross sales. The cost of goods sold is determined by adding to opening inventory for the year the purchases (cost of goods acquired during that year) and subtracting from that sum the closing inventory (goods still on hand at the end of that year). Thus, any undervaluation of ending inventory for a taxable year increases the cost of goods sold, decreases the income from sales, and results in a lower profit for that year. Since each year's closing inventory becomes the opening inventory for the succeeding year, the system will automatically self-correct whenever the closing inventory is correctly valued. The cumulative income over the period of years involved will be the same total, but income will be deferred each year until the closing inventory is finally corrected. * * * [*Primo Pants Co. v. Commissioner, supra* at 723-724.]

A change in accounting method occurs when there is a change in the overall method of accounting for gross income and deductions, and also when there is a change in the treatment of a "material item." See secs. 1.446-1(e)(2)(ii)(a) and 1.481-1(a)(1), Income Tax Regs. With respect to inventories specifically, the regulations provide:

(c) A change in an overall plan or system of identifying or valuing items in inventory is a change in method of accounting. Also a change in the treatment of any *material item used in the overall plan for identifying or valuing items* in inventory is a change in method of accounting. [Sec. 1.446-1(e)(2)(ii)(c), Income Tax Regs. Emphasis added.]

A "material item" is "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction." Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs. See sec. 1.481-1(a)(1), Income Tax Regs.[6] "The essential characteristic of a 'material item' is that it determines the timing of income or deductions. See Bittker, supra note 1, par. 105.6.2, at 124-25." *Knight-Ridder Newspaper v. United States,* 743 F.2d 781, 798 (11th Cir. 1984) (fn. ref. omitted). When an accounting practice merely postpones the reporting of income, rather than permanently avoiding the reporting of income over the taxpayer's lifetime, it involves the proper time for reporting income. *Copy Data, Inc. v. Commissioner,* 91 T.C. 26, 30 (1988); *Primo Pants Co. v. Commissioner, supra* at 723; *Schuster's Express, Inc. v. Commissioner,* 66 T.C. 588, 597 (1976), affd. without opinion 562 F.2d 39 (2d Cir. 1977); *Graff Chevrolet Co. v. Campbell,* 343 F.2d 568, 572 (5th Cir. 1965).

"When a taxpayer uses an accounting method which reflects an expense before it is proper to do so or which defers an item of income that should be reported currently, he has not succeeded (and does not purport to have succeeded) in permanently avoiding the reporting of any income; he has impliedly promised to report that income at a later date, when his accounting method, improper though it may be, would require it. Section 481, therefore, does not hold the taxpayer to any income which he has any reason to believe he has avoided, and does not frustrate the policy that men should be able, after a certain time, to be confident that past wrongs are set at rest." Note, Problems Arising from Changes in Tax-Accounting Methods, 73 Harv.L.Rev. 1564, 1576 (1960). [*Graff Chevrolet Co. v. Campbell, supra* at 572.]

A change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability. Sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs. A posting error is an error in "the act of

---

[6]Sec. 1.481-1(a)(1), Income Tax Regs., defines a change in accounting method as including "a change in the over-all method of accounting for gross income or deductions, or a change in the treatment of a material item." Sec. 1.481-1(a)(1), Income Tax Regs., also incorporates by reference the rules of sec. 446(e) and sec. 1.446-1(e), Income Tax Regs., for determining when a change in accounting method has occurred.

transferring an original entry to a ledger." Black's Law Dictionary 1050 (5th ed. 1979).

Since petitioner's pre-1982 method of determining inventory involved the proper time for reporting income, it was a "material item." Petitioner's change from a seriously flawed and disorganized method of determining inventory to a method of determining both opening and ending inventory for fiscal year 1982 on the basis of a complete physical inventory is a change in the treatment of a material item and, therefore, constitutes a change in accounting method. A change in method of accounting occurs even when there is a change from an incorrect to a correct method of accounting. *First National Bank of Gainesville v. Commissioner*, 88 T.C. 1069, 1085 (1987); *H.F. Campbell Co. v. Commissioner*, 53 T.C. 439, 447 (1969), affd. 443 F.2d 965 (6th Cir. 1971); *Dearborn Gage Co. v. Commissioner*, 48 T.C. at 197-198.

Petitioner relies solely on *Korn Industries, Inc. v. United States*, 209 Ct. Cl. 559, 532 F.2d 1352 (1976), to support its position that petitioner merely corrected mathematical errors in counting and that there was no accounting method change. In *Korn*, the taxpayer was a furniture manufacturer who computed the value of its inventories by taking separate inventories of its raw materials, work-in-process, supplies, and finished goods based upon actual cost and physical count calculations. The cost of each piece of furniture in the finished goods inventory was determined based on an aggregate of the cost of labor, materials, and overhead for that piece. The taxpayer discovered that its accountants had not included three of the 14 materials costs in their calculations of the finished goods inventories for a number of years. The omissions caused taxable income to be understated due to overstatements in cost of goods sold. The taxpayer corrected the understatement of inventory and reported its opening inventory in an amount greater than its ending inventory for the preceding year.[7] The Commissioner determined that the adjustments resulted in a change of accounting method. The court found that the omissions had been inadvertent, and held that the taxpay-

---

[7]For a discussion of *Korn Industries, Inc. v. United States*, 209 Ct. Cl. 559, 532 F.2d 1352 (1976), see *Superior Coach of Florida v. Commissioner*, 80 T.C. 895, 912-914 (1983).

er's act of adjusting inventory constituted a correction of an error analogous to a mathematical or posting error. *Korn Industries, Inc. v. United States,* 532 F.2d at 1356.

The instant case is distinguishable from *Korn.* In *Korn,* the items omitted from inventory constituted a small percentage of the overall inventory. The omission was traceable to three cost elements that the taxpayer's accountants had mistakenly omitted. But for these relatively small adjustments the taxpayer's method of accounting was proper. The Court of Claims found the error to be analogous to a mathematical or posting error. In contrast, the error in petitioner's opening inventory as of March 1, 1981, which was revealed by its physical inventory, disclosed a gross understatement of inventory. The physical inventory was ten times greater than the book inventory. The facts reveal that the inaccuracies in petitioner's inventory records prior to 1982 stemmed from systemic problems, at the heart of which appears to be the disorganized condition of petitioner's warehouse. Despite knowing of these problems, petitioner continued to simply verify its inventory by selecting about 300 inventory items per year and trying to physically locate the items where they *should have been* stored. If the item were not found in the designated location in petitioner's disorganized 70,000 square foot warehouse, petitioner would simply write off the item rather than look further. This practice and the other aforementioned systemic flaws in petitioner's pre-1982 system simply cannot be described as mere mathematical or posting errors.[8]

Prior to 1982, petitioner consistently used a method of determining inventory which resulted in premature write-downs of ending inventory. This constituted a method of accounting. Sec. 1.446-1(a)(1) and (e)(2)(ii)(a), Income Tax Regs.; *H.F. Campbell Co. v. Commissioner, supra* at 447. Petitioner's determination of both opening and ending inventory for fiscal 1982 based upon a complete physical inventory is a change in method of accounting. See sec. 1.446-1(e)(2)(ii)(c), Income Tax Regs.

---

[8]Since we have concluded that *Korn, Industries, Inc. v. United States, supra,* is factually distinguishable, we need not decide whether to follow that decision. The Commissioner has announced that he will not follow the *Korn* decision. Rev. Rul. 77-135, 1977-1 C.B. 132. See *Superior Coach of Florida v. Commissioner, supra* at 911.

Since we have concluded that there was a change in the method of accounting used by petitioner in the taxable year in issue, section 481 is applicable.

*Decision will be entered under Rule 155.*