T.C. Memo. 2010-211


UNITED STATES TAX COURT


HEALTH INVESTMENT CORP. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24831-08.              Filed September 30, 2010.


<u>Steven Ray Mather</u> and <u>Elliott H. Kajan</u>, for petitioner.

<u>Joyce M. Marr</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COHEN, <u>Judge</u>:  Respondent determined a Federal income tax
deficiency of $1,829,108 for petitioner's tax (and fiscal) year
ending April 30, 1997.  After concessions, the issue for decision
is whether petitioner is entitled to the section 481(a)
adjustment resulting from a change in the method of accounting
for bad debts as claimed on the tax return.  Unless otherwise

indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioner is the common parent of an affiliated group of corporations. At the time the petition was filed, petitioner's principal place of business was in California. Petitioner filed consolidated Federal income tax returns for its tax and fiscal years ending April 30, 1996, 1997, and 1998. Ernst & Young, L.L.P., a public accounting firm, prepared petitioner's tax returns for fiscal years ending (FYE) in 1997 and 1998.

Petitioner, through its subsidiaries, operated five hospitals during its FYE April 30, 1997. Before this tax year, petitioner used a reserve method of accounting for bad debts for both financial and tax accounting.

In its financial accounting, petitioner maintained combined contractual and bad debt allowances (sometimes called "bad debt reserve") accounts. A contractual allowance reflects amounts petitioner is not entitled to collect because of contractual agreements with healthcare payers. The bad debt allowance reflects the amount petitioner is entitled to collect, but does not collect.

During the 1990s, Linda Bentley (Bentley) held the position of controller and then chief financial officer for petitioner. At Ernst & Young's request, Bentley prepared a schedule entitled "Contractual/Bad Debt Exp Analysis" for three of petitioner's subsidiaries that she understood would be used for an application to the Internal Revenue Service (IRS) to request a change in methods of accounting. Bentley's schedule purportedly identified the bad debt portion in the combined contractual and bad debt allowance accounts as of April 30, 1996. Bentley used petitioner's accounts receivable aging reports, determined a reserve percentage for what petitioner termed financial classes (groupings of similar sources of petitioner's revenue and accounts receivable), and then categorized the classes as contractual, bad debt, or a combination of the two using petitioner's files and information obtained from petitioner's business office. Where petitioner had agreed to a payment amount, Bentley determined what had been paid, what the charges were, and whether an unpaid portion was a contractual or a bad debt allowance. From this historical analysis, Bentley determined percentages that reflected the general collection amount for a particular class. Bentley applied the percentages to the respective financial classes that had combined contractual and bad debt amounts to determine the bad debt amount.

Petitioner submitted a Form 3115, Application for Change in Accounting Method, to the IRS requesting permission to change the method of accounting for bad debts for the taxable year that began May 1, 1996, for three of its subsidiaries: (1) Bay Cities Medical Center (Bay Cities); (2) Jupiter Bellflower Doctors Hospital (Jupiter Bellflower); and (3) Los Angeles Doctors Hospital Corp. (LA Doctors). Petitioner included documents with the Form 3115 indicating that if the method of accounting for bad debts were changed, under section 481(a) an adjustment for the amount of the reserve for bad debts as of the close of FYE April 30, 1996, would be required as follows: (1) $310,311 for Bay Cities; (2) $339,138 for Jupiter Bellflower; and (3) $500,261 for LA Doctors, for a total section 481(a) adjustment of $1,149,710. These reported figures correspond to the amounts on the schedules Bentley prepared for the three subsidiaries.

The parties entered into a consent agreement in November 1997, with the IRS granting permission for the three subsidiaries to change their method of accounting for bad debts from the reserve method to the specific chargeoff method. (The three subsidiaries continued to use the reserve method of accounting for bad debts for financial accounting purposes.) According to the executed consent agreement:

> The information [petitioner furnished] * * * indicates that as of the beginning of the year of change the adjustment required under section 481(a) * * * is computed as follows:

Bay Cities Medical Center                          $310,311
Jupiter Bellflower Doctors Hospital        339,138
Los Angeles Doctors Hospital Corporation   500,261

Total adjustment (increase in computing
    consolidated taxable income)          $1,149,710

The taxpayers' request has been determined to be a change from a Category A method of accounting as defined in section 3.06 of Rev. Proc. 92-20, 1992-1 C.B. 685. Section 3.06 of Rev. Proc. 92-20 defines a Category A method of accounting as a method of accounting that the taxpayer is specifically not permitted to use under the Internal Revenue Code, the Income Tax Regulations, or a decision of the Supreme Court of the United States. A Category A method is also a method of accounting that differs from a method the taxpayer is specifically required to use under the Code, the regulations, or a decision of the Supreme Court of the United States.

Section 5.03(1)(a) of Rev. Proc. 92-20 provides that when there is a change in method of accounting from a Category A method of accounting (as defined in section 3.06) that results in a net positive section 481(a) adjustment, the taxpayer must, beginning with the year of change, take the net section 481(a) adjustment into account ratably over 3 tax years in computing taxable income.

The amount of the adjustment, which is to be taken into account over a three-year period (adjustment period), is subject to verification by the district director upon examination of the consolidated income tax return.

    *       *       *       *       *       *       *

An examining agent may not propose that the taxpayers change the same method of accounting as that changed by the taxpayers under this ruling for a year prior to the year of change. * * *

Petitioner reported the ratable portion of the claimed

section 481(a) adjustment on Form 1120, U.S. Corporation Income

Tax Return, dated January 15, 1998 (9704 Form 1120), as follows:

| | | | |
|---|---|---|---|
| Bay Cities | $310,311/3 | = | $103,437 |
| Jupiter Bellflower | 339,138/3 | = | 113,046 |
| LA Doctors | 500,261/3 | = | 166,754 |
| Total | | | 383,237 |

On the 9704 Form 1120, petitioner claimed current year deductions for bad debts of $366,033 for Bay Cities, $729,246 for Jupiter Bellflower, and $518,099 for LA Doctors.  On the attached Schedule M-1, Reconciliation of Income (Loss) per Books With Income per Return, petitioner reported the deductions on the return not charged against book income for this year for the three subsidiaries.  To calculate these book-to-tax adjustments, petitioner used the figures Bentley calculated as the bad debt reserve account balances as of FYE April 30, 1996 (and hence the beginning of the next fiscal year, May 1, 1996), and subtracted the bad debt allowance amounts as of FYE April 30, 1997, as follows:

| | Bad Debt Allowance Amounts | | 1997 Form 1120 |
|---|---|---|---|
| | May 1, 1996 | Apr. 30, 1997 | Schedule M-1[1] |
| Bay Cities | $310,311 | $37,018 | $273,293 |
| Jupiter Bellflower | 339,138 | 122,736 | 216,402 |
| LA Doctors | 500,261 | 16,227 | 484,034 |

[1]Line 8, Deductions on this return not charged against book income this year.

For the Form 1120 petitioner filed for FYE April 30, 1998, petitioner used this same method to calculate the bad debt reserve amounts for these subsidiaries and used the following fiscal year beginning and ending amounts for the bad debt allowance amounts:

|  | Bad Debt Allowance Amounts | | 1998 Form 1120 |
|  | May 1, 1997 | Apr. 30, 1998 | Schedule M-1 |
| Bay Cities | $37,018 | [1]-0- | [2]$37,018 |
| Jupiter Bellflower | 122,736 | $222,172 | [3](99,436) |
| LA Doctors | 16,227 | 173,624 | [4](157,397) |

[1]Bay Cities was temporarily closed at the end of FYE Apr. 30, 1998.

[2]Line 8, Deductions on this return not charged against book income this year.

[3]Line 5, Expenses recorded on books this year not deducted on this return.

[4]Line 5.

Upon review of documents that petitioner supplied for each of the three subsidiaries during the IRS examination of petitioner's Federal income tax return, an IRS revenue agent prepared a worksheet on or before January 22, 2001, noting that those documents identified two different amounts for petitioner's bad debt reserve as of April 30, 1996. One amount was petitioner's reported section 481(a) adjustment on the Form 3115, as reported ratably on the 9704 Form 1120. The revenue agent identified a different amount on worksheets prepared by Ernst & Young.

The Ernst & Young worksheet amounts were calculated for each subsidiary by multiplying the subsidiary's combined contractual allowance and bad debt allowance account amount by an allowance percentage to determine the bad debt allowance amount, with the remainder allocated to the contractual allowance. The bad debt allowance amounts Ernst & Young calculated for the subsidiaries as of April 30, 1996, are as follows:  (1) $23,615 for Bay

Cities; (2) $146,547 for Jupiter Bellflower; and (3) $54,889 for LA Doctors. Using these figures, the ratable portion of the section 481(a) adjustment is $75,017.

The revenue agent requested documentation to verify petitioner's determination of the bad debt reserve amounts as of April 30, 1996, for the three subsidiaries as claimed on the tax return. In response, an Ernst & Young accountant acting as petitioner's representative during the examination provided for each subsidiary the calculation used to derive the bad debt reserve amount. The documents provided showed each subsidiary's bad debt reserve equal to the gross accounts receivable multiplied by a bad debt percentage "(per client)". The revenue agent concluded that the percentages could not be explained or verified and thus the bad debt reserve amounts were not proper.

The revenue agent did not question petitioner's calculated balances of the bad debt reserves as of April 30, 1997, used to compute the corresponding Schedule M-1 adjustments for each of the three subsidiaries, according to the Ernst & Young worksheets supplied: (1) $37,018 for Bay Cities; (2) $122,736 for Jupiter Bellflower; and (3) $16,227 for LA Doctors. To calculate these amounts, the same method was used as that used for FYE April 30, 1996.

The revenue agent concluded that the amounts of the bad debt reserves as of April 30, 1996, on the Ernst & Young worksheets

were the correct figures--not the amounts that Bentley calculated that were reported on the consent agreement and tax return. Using the Ernst & Young worksheet amounts, the revenue agent determined that: (1) Petitioner's section 481(a) adjustment should be reduced by $308,220 because petitioner included an adjustment in income of $383,237 that should have been $75,017 and (2) petitioner should have reported aggregate Schedule M-1 adjustments decreasing taxable income by $62,473 and a Schedule M-1 adjustment decreasing taxable income by $13,403, rather than aggregate Schedule M-1 adjustments of $973,729, thus decreasing the section 166 bad debt deduction by $924,659. The revenue agent's calculations resulted in a net increase to taxable income of $616,439 ($924,659 less $308,220) for FYE April 30, 1997.

The Form 886-A, Explanation of Adjustments, attached to the July 17, 2008, notice of deficiency sent to petitioner, stated that

> It is determined that the deductions for bad debts, resulting from an authorized change in accounting method for taxable year ending April 30, 1997, is disallowed to the extent of $616,439.00 because the IRC Section 481(a) adjustment was computed incorrectly. Accordingly, your taxable income for the taxable year ending April 30, 1997 is increased $616,439.00.

### OPINION

Petitioner argues that respondent's redetermination of the April 30, 1996, bad debt reserve amount is barred by the consent agreement and is not properly raised in the notice of deficiency.

Petitioner further asserts that respondent bears the burden of proof regarding the redetermination of the bad debt reserve amount because this is a "new matter" according to Rule 142(a).

Petitioner argues that respondent violated the consent agreement term that prohibits respondent from proposing that petitioner change the method of accounting for a year before the year of change. Petitioner asserts that respondent applied an "improper" accounting method to determine the bad debt reserve amount that resulted in a taxable income increase.

Respondent's revenue agent explained at trial that he did not adjust the April 30, 1996, bad debt reserve amounts using an accounting method that petitioner began using in FYE April 30, 1997. He analyzed documents that petitioner supplied and determined that the Ernst & Young bad debt reserve amounts for FYE April 30, 1996, and hence for the fiscal year that began May 1, 1996, were the figures that should be used for the section 481(a) adjustment and not those reported on the Form 3115 and tax return that Bentley calculated. No change in method of accounting was proposed for FYE April 30, 1996, and the consent agreement, subject to verification by the district director upon examination of petitioner's consolidated tax return, was not violated.

We also reject petitioner's argument that the notice of deficiency did not provide notice that the basis for respondent's

adjustment to the bad debt deduction included a determination of bad debt allowance amounts as of April 30, 1996. Section 7522(a) provides that a notice of deficiency "shall describe the basis for, and identify the amounts (if any) of, the tax due, interest, additional amounts, additions to the tax, and assessable penalties included in such notice. An inadequate description * * * shall not invalidate such notice." The purpose of section 7522 is to give the taxpayer notice of the Commissioner's basis for determining a deficiency. See Shea v. Commissioner, 112 T.C. 183, 196 (1999). The objective language in the notice of deficiency remains the controlling factor. Id. at 192.

The notice sent to petitioner stated that the section 481(a) adjustment was "computed incorrectly". Petitioner supplied the figures for the section 481(a) adjustment with the application for the accounting method change and subsequently used them for the filed 9704 Form 1120. Bentley's schedules for the three subsidiaries identified these figures as the bad debt allowance amounts as of April 30, 1996. These computed amounts were different from those respondent contends are correct, as identified on the Ernst & Young worksheets, and resulted in respondent's income adjustments. During the examination, the revenue agent identified the issue and requested that petitioner verify the amounts petitioner reported. Nothing in the notice is

inconsistent with respondent's position in this case (unlike <u>Shea</u> <u>v. Commissioner</u>, <u>supra</u>).

Petitioner objects to our consideration of how respondent's adjustments occurred as "going behind" the statutory notice. The events of the audit, however, are relevant to petitioner's claims regarding the adequacy of the notice. See generally <u>id.</u> They are also relevant to petitioner's claims that the Court should excuse petitioner's belated production at trial of additional schedules used by Bentley because petitioner was surprised by respondent's position. We conclude that the notice apprised petitioner of the basis for respondent's adjustment and that petitioner was neither surprised nor prejudiced regarding respondent's position that the amounts of the bad debt reserves as of April 30, 1996, are in dispute.

Petitioner next asserts that respondent raised a "new matter" regarding the redetermination of the bad debt allowance amounts and thus the burden of proof shifts to respondent. See Rule 142(a). Respondent acknowledges that the recomputation of the amounts of petitioner's bad debt reserves as of April 30, 1996, was not expressly mentioned in the notice but asserts that it is implicit in respondent's explanation that the section 481(a) adjustment was computed incorrectly.

If the Commissioner advances a new theory that either alters the original deficiency or requires presentation of new evidence,

the Commissioner bears the burden of proof as to this new matter. Shea v. Commissioner, supra at 191-197; Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989). We conclude that respondent has not advanced a new theory by redetermining the amounts of the bad debt reserves as of April 30, 1996, because these amounts are a direct component of the section 481(a) adjustment. See sec. 481(a); Bird Mgmt., Inc. v. Commissioner, 48 T.C. 586 (1967). Thus, the burden of proof remains with petitioner. See Shea v. Commissioner, supra at 197.

Respondent argues that petitioner overstated the ratable portion of the section 481(a) adjustment for the year in issue by $308,220 (aggregate bad debt reserve amount for three subsidiaries as of April 30, 1996: $383,237 (as identified by Bentley and reported by petitioner) less $75,017 (as identified on the Ernst & Young worksheets and determined as the correct amount by respondent)). This difference results in a decrease of petitioner's claimed deduction for bad debts under section 166 and an increase in income. Respondent asserts that petitioner has not established that the amounts it claimed as the balances of the bad debt reserves for the three subsidiaries as of April 30, 1996, equaled the deductions previously claimed for Federal income tax purposes. Petitioner counters that petitioner's determination of the bad debt allowances as of April 30, 1996, is "vastly more reliable and accurate than respondent's

determination" and that respondent "used the wrong concept, the wrong accounting method and the wrong schedules" to redetermine the bad debt allowances as of April 30, 1996, for the three subsidiaries. Despite petitioner's rhetoric, neither the Ernst & Young calculations nor respondent's reliance on them has been shown to result in an erroneous adjustment.

Section 166(a) provides that taxpayers are allowed a deduction for "any debt which becomes worthless within the taxable year" (the specific chargeoff method). Before being repealed by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 805, 100 Stat. 2361, section 166(c) provided that, alternatively, accrual basis taxpayers could use the reserve method to deduct "a reasonable addition to a reserve for bad debts." See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 546 (1979). As we explained in Bird Mgmt., Inc. v. Commissioner, supra at 595-596:

> Essentially a bad debt reserve constitutes an estimate of the loss which can reasonably be expected to result from worthlessness of debts outstanding at the close of the taxable year. Under the reserve method when specific debts become worthless they are charged against the reserve and serve to reduce the credit balance therein. Then, if any amount which has been charged against the reserve is subsequently collected the collection does not result in the receipt of income but the amount collected is credited to the reserve. If the credit balance in the reserve at the end of the year is not adequate to cover the reasonably expected loss with respect to the debts outstanding at the end of the year, then an addition is made to the reserve to bring the credit balance to the appropriate amount, and such addition is deductible. * * * And the general rule is well established that any balance in a reserve for bad debts existing when the reserve becomes

no longer necessary must be included in taxable income,
since the amount of such balance represents amounts
which have been previously deducted.  * * *

When a taxpayer changes from the reserve method of bad debt
accounting to the specific chargeoff method, the credit balance
in the reserve account is returned to income in the year of
change.  See Arcadia Sav. & Loan Association v. Commissioner, 300
F.2d 247, 250 (9th Cir. 1962), affg. 34 T.C. 679 (1960).  Section
481(a) requires that the adjustments necessary to prevent amounts
from being duplicated or omitted be taken into account when the
taxpayer's taxable income is computed under a method of
accounting that is different from the method used to compute
taxable income the preceding year.  Section 481(c) and section
1.481-4, Income Tax Regs., provide that the adjustment required
may be taken into account in determining taxable income in the
manner and subject to the conditions agreed to by the
Commissioner and the taxpayer or prescribed by regulations.  The
taxpayer has the burden of proof as to the proper section 481(a)
adjustment.  See Hitachi Sales Corp. of Am. v. Commissioner, T.C.
Memo. 1994-159, supplemented by T.C. Memo. 1995-84.

Because of the change in accounting method for bad debts
from the reserve method to the specific chargeoff method,
petitioner was required to report the credit balance remaining in
the bad debt reserve accounts as of April 30, 1996.  See sec.
481(a); Arcadia Sav. & Loan Association v. Commissioner, supra.

Whether a taxpayer is on the specific chargeoff or the reserve method of treating bad debts, there must be an annual review of doubtful accounts receivable to ascertain whether certain accounts are either uncollectible or that there is reasonable probability that they are not collectible. Rogan v. Commercial Disc. Co., 149 F.2d 585, 587-588 (9th Cir. 1945). Accordingly, Ernst & Young prepared worksheets for each subsidiary that identified the bad debt reserve account amounts, including fiscal years 1996-98. (Petitioner used the reserve method of accounting for financial purposes during all relevant years.) Respondent contends that it is these amounts that petitioner should have used to calculate the section 481(a) adjustment--not the figures that Bentley calculated and petitioner used.

Although Bentley conducted an extensive exercise to analyze the combined contractual and bad debt allowance accounts as of April 30, 1996, we are not persuaded that the ascertained bad debt allowance amounts are more accurate than those of the Ernst & Young worksheets for purposes of determining petitioner's section 481(a) adjustment. Petitioner did not call anyone from Ernst & Young to explain those worksheets or to reconcile discrepancies. According to Bentley's prepared schedule and explanation, it appears her determination regarding each outstanding receivable supports an analysis of bad debts for

partial or total worthlessness.  A determination of partial and total worthlessness of bad debts is important for the specific chargeoff method because a taxpayer may claim a deduction when a business debt becomes either partially or wholly worthless.  Sec. 166.

As respondent notes, Bentley's calculations do not purport to reconcile the amounts that she determined to be the balances of the bad debt reserve accounts as of April 30, 1996, to the amounts deducted on petitioner's Federal income tax returns for bad debt expenses in earlier years (and before the accounting method change).  The bad debt credit balance remaining in petitioner's allowance account as of April 30, 1996, is reported for tax purposes under section 481(a).  See Arcadia Sav. & Loan v. Commissioner, supra at 250.  We sustain respondent's determination that the bad debt reserve account amounts calculated by Ernst & Young should be used for purposes of the section 481(a) adjustment because petitioner has not established that those amounts are incorrect.

Petitioner argues that respondent's position causes petitioner to be taxed twice on the same income.  The testimony of Bentley is inconclusive about whether a protective claim for refund protects petitioner in this regard.  In any event, we address only the year before us.

In reaching our decision, we have considered all arguments made by the parties.  To the extent not mentioned or addressed, they are irrelevant or without merit.  To reflect concessions and our conclusions stated above,

<u>Decision will be entered under Rule 155</u>.